Filed 11/7/24  In re Marcus P. CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re MARCUS P., a Person Coming Under the Juvenile Court Law. | B333822 (Los Angeles County Super. Ct. No. 18CCJP04408) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>N.C.,<br><br>        Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Tamara E. Hall, Judge.  Affirmed.

Lori Siegel, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant Conty Counsel, and Stephen Watson, Senior Deputy County Counsel, for Plaintiff and Respondent.

_____

N.C. (Mother) appeals from the juvenile court's visitation order made after the court appointed a legal guardian for eight-year-old Marcus P. at the selection and implementation hearing (Welf. & Inst. Code, § 366.26)[1] and terminated dependency jurisdiction. Mother contends the court abused its discretion by requiring visitation to be monitored by an unpaid monitor mutually agreed to by Mother and the legal guardian or a professional monitor paid for by Mother. She argues the visitation order is illusory because the legal guardian and Mother do not get along and she cannot afford a professional monitor. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *The 2018 Dependency Petition and Mother's First Appeal*

On July 16, 2018 the Los Angeles County Department of Children and Family Services (Department) filed a dependency petition under section 300, former subdivision (b)(1), on behalf of then-four-year-old Marcus alleging Mother physically abused him by forcibly shaking and striking his body. On August 7, 2008 the juvenile court sustained the allegations in the petition; declared Marcus a dependent of the court; removed him from Mother's

_____

[1] Further statutory references are to the Welfare and Institutions Code.

2

physical custody; and ordered family reunification services and monitored visitation for Mother.  Mother appealed from the jurisdiction findings and disposition order, and we affirmed. (*In re Marcus P.* (Mar. 20, 2019, B292348) [nonpub. opn.].)  On August 24, 2020 the juvenile court terminated jurisdiction and entered a juvenile custody order granting joint legal custody to Mother and Mark P. (Father) and physical custody and primary residence to Mother.

B.      *The 2020 Dependency Petition and Mother's Second Appeal*
On December 29, 2020 the Department filed another dependency petition under section 300, former subdivision (b)(1), on behalf of Marcus.  The petition alleged Mother was unable and unwilling to provide Marcus with ongoing care and supervision because she requested Marcus's removal from her home on December 24, 2020 (stating in her call to the Department's hotline that Marcus had pushed her to her limits and she was concerned she would do something to him and end up in jail).  On April 1, 2021 the Department filed a first amended petition adding two counts under section 300, former subdivision (b)(1), based on Mother's history of physically abusing Marcus, and Mother and Father's domestic violence in Marcus's presence.  The juvenile court sustained the allegations in the amended petition; declared Marcus a dependent of the court; removed him from Mother's physical custody; and ordered family reunification services and monitored visitation for Mother.  Mother timely appealed from the jurisdiction findings and disposition order, and we affirmed.  (*In re Marcus P.* (June 10, 2022, B313339) [nonpub opn.].)

3

C.     *Mother's Section 388 Petition and Third Appeal*

On October 4, 2021 Mother filed a section 388 petition seeking return of Marcus to her physical custody or unmonitored or overnight visits.  On December 16, 2021, following an evidentiary hearing, the juvenile court denied Mother's petition.  The court found Mother failed to show changed circumstances and her request was not in Marcus's best interest.  Mother timely appealed the denial of her section 388 petition.  Mother's appellate counsel filed an opening brief stating she was unable to identify any arguable issues and indicating she had advised Mother that if Mother did not personally submit her contentions within 30 days, her appeal would be dismissed.  (See *In re Phoenix H.* (2009) 47 Cal.4th 835, 838, 845.)  Mother did not file a response, and this court dismissed her appeal.

D.     *The Review Hearings, Selection and Implementation Hearing, and Mother's Fourth Appeal*

At the March 2, 2022 six-month review hearing (§ 366.21, subd. (e)), Marcus's attorney informed the juvenile court that Marcus's caregiver, maternal great-aunt Vernessa C., was not open to hosting Mother's visits at Vernessa's home because there were ongoing disagreements and tension between them.  The court noted Mother was residing in Nevada, and Vernessa and Marcus were living in Los Angeles County.  The court acknowledged Vernessa was unwilling to monitor Mother's visitation at her home because of friction between Vernessa and Mother.  The court ordered the Department to monitor Mother's in-person visits with Marcus in Los Angeles County.  At the October 19, 2022 12-month review hearing (§ 366.21, subd. (f)), the court found Mother had made minimal progress with her case

4

plan. The court terminated Mother's family reunification services over her objection and set a selection and implementation hearing for February 15, 2023.

At the February 15 selection and implementation hearing (§ 366.26), Mother told the court that Vernessa was abusing Marcus and Mother saw a bruise on his face during a visit by videoconference. Mother requested Marcus's removal from Vernessa's care based on child abuse. The juvenile court continued the hearing and ordered the Department to investigate Mother's allegations.

At the February 21, 2023 continued hearing, the Department reported that the social worker had interviewed Marcus and Vernessa about the physical abuse allegations. Vernessa admitted she and a male cousin, Tony, had last spanked Marcus approximately two years prior. Vernessa acknowledged no corporal punishment should be used to discipline Marcus, and she was now using time outs and taking away privileges from him. The juvenile court found, based on the social worker's interviews with Vernessa, Tony, and Marcus, that Vernessa and Tony stopped using corporal punishment in 2022. The court appointed Vernessa as Marcus's legal guardian over Mother's objection. As part of the legal guardianship order, the court ordered, "Monitored visits and monitored phone contact, with a professional monitor paid 100% by the Mother." The court terminated dependency jurisdiction with Kin-GAP funding in place.[2]

---

[2] "The Kin-GAP program is a state program that provides ongoing funding for children who exit the dependency system to

5

Mother timely appealed from the orders appointing Vernessa as legal guardian and terminating dependency jurisdiction over Marcus. Pursuant to a joint stipulation by Mother and the Department, on September 21, 2023 this court conditionally affirmed the legal guardianship order, reversed the order terminating jurisdiction, and remanded the matter "for the sole purpose of the juvenile court holding a noticed hearing with counsel for all parties reappointed to make a visitation order that specifies the frequency and duration of monitored visits" between Mother and Marcus.

E.  *The November 2023 Report and Hearing on Visitation*

On November 22, 2023 the Department filed a last minute information for the court regarding Mother's visitation with Marcus. In a November 17 telephone interview with the social worker, Mother stated, "I'm in Vegas. The caregiver won't let me see him. I can't call him." The social worker reminded Mother that the juvenile court had ordered Mother to pay for a professional monitor to monitor the in-person visits and telephone calls. Mother responded, "No, all [Vernessa] has to do is work with me. I am homeless, I don't have money for that, this is all your fault. I am going to sue the county for this, you and the other workers and supervisors." The social worker

---

live with relative legal guardians. In order to receive funding under the program the county welfare agency must enter into a written binding agreement with the relative guardian and dependency jurisdiction must be terminated. (§§ 11386, 11387.)" (*In re Priscilla D.* (2015) 234 Cal.App.4th 1207, 1211, fn. 2.)

6

terminated the call because Mother refused to speak appropriately with him.

The social worker also spoke with Vernessa on November 17, who reported Mother had called on Marcus's birthday in July and again in early November. On each occasion Vernessa asked Marcus to speak with Mother by phone, but he refused. When asked if Mother had visited Marcus in person, Vernessa responded, "When I became the Legal Guardian, the documents indicate[d] that she needs to be monitored, and pay for the monitor. She won't do that, and I am not going to violate that order." Vernessa added, "Last week she was driving up and down the street multiple times. She came up to my porch yelling that I was keeping her away from her son. I brought Marcus to the door, he said Hi and then ran back to his room." Vernessa recounted, "Like she does when she comes around, she calls Law Enforcement and they check on him and they ask me if she has mental illness. It's always a mess." Vernessa was not willing to be the visitation monitor. She explained, "I did that in the past and that didn't go well. She accused me of hurting the child and after that I would not do it again." Vernessa added, "I have no problem letting her see her son, but she needs to have the monitor, it is a Court order."

In his interview with the social worker, Marcus reported that Mother visited him twice in the prior year. Marcus added, "She did call but I didn't want to talk to her. I don't want to see her anymore." When Marcus was asked why he did not want to see Mother anymore, he did not respond. Instead, he began talking about his favorite video games.

On November 29, 2023 the juvenile court held a hearing on the visitation order. Mother was not present at the hearing or

connected by telephone, but her attorney indicated Mother had given her directions.  Mother's attorney requested unmonitored visits for Mother, adding, "If the court does deny Mother's request for unmonitored visits, Mother was informed that she needed to have a paid monitor 100 percent paid by her.  She's not able to pay for a monitor.  She's currently unemployed and unhoused and is living in her vehicle.  She's not able to provide any funds to have a monitor.  So by having Mother only be able to have a professional paid monitor would, essentially, be stating that she cannot have any visits with her child.  So she would request that either the legal guardian select and name an individual that would monitor visits, not necessarily legal guardian but an individual selected by legal guardian, and that person be listed in the legal guardianship paperwork to be the monitor.  Or that legal guardian share in any costs for a professional monitor, because, at this time, Mother is unable to have any visits based on financial reasons.  So with that said, she would request unmonitored or for the monitor not to be a professionally paid monitor."

Marcus's attorney requested monitored visitation once a week for one hour minimum, monitored by a professional monitor because Mother "does have a history of acting inappropriately during visits and needing redirection."  Marcus's attorney continued, "We understand the financial burden on mom, but she does have a history of needing direction, making comments that are hard on the minor.  And so we are asking that the visits be monitored by someone who has history with monitoring."  Mother's attorney responded, "The point of having a monitor is for the exact reasons that minor's counsel indicated[,] that doesn't have to be a professionally-paid monitor.  And, again, if

it's only professionally paid, then Mother cannot have visits. That's asking for a no visitation order, essentially. And I never requested that legal guardian have to monitor. I requested that legal guardian name an individual that she's comfortable with monitoring visits for Mother if the court doesn't order unmonitored visits." The Department's attorney objected to unmonitored visits by Mother, arguing, "As to Mother's inability to pay for the monitor, I believe the typical order is that they can use the monitor that's agreed upon. At this point, there is no agreement; so Mother has no choice."

The juvenile court ruled, "The frequency of the visitations is a minimum of one time a month, minimum of one hour per visit. The legal guardian shall not act as monitor. The court cannot force the legal guardian to sit as monitor when there is [a] documented history of Mother's conflict with the legal guardian. With respect to the legal guardian selecting an individual, the Mother and the legal guardian can agree upon an individual to monitor . . . . And if they cannot agree upon a person to monitor, a person being someone 21 years or older, then the monitor will have to be a professional monitor paid 100 percent by the Mother. The request that the legal guardian share in the cost of the monitor[ed] visitation is denied."

Mother timely appealed.

## DISCUSSION

"When, as here, the juvenile court orders a legal guardianship at the permanency planning hearing, it must 'make an order for visitation with the parents . . . unless the court finds by a preponderance of the evidence that the visitation would be

9

detrimental to the physical or emotional well-being of the child.' (§ 366.26, subd. (c)(4)(C).)" (*In re Ethan J.* (2015) 236 Cal.App.4th 654, 661; accord, *In re Rebecca S.* (2010) 181 Cal.App.4th 1310, 1313; *In re M.R.* (2005) 132 Cal.App.4th 269, 274 ["the trial court was required to make a visitation order unless it found that visitation was not in the children's best interest"].)  "[T]he juvenile court cannot delegate the decision whether visitation will occur to any third party, including the child, the social services agency, or the guardian." (*In re Korbin Z.* (2016) 3 Cal.App.5th 511, 516; accord, *In re T.H.* (2010) 190 Cal.App.4th 1119, 1123 ["The power to determine the right and extent of visitation by a noncustodial parent in a dependency case resides with the court and may not be delegated to nonjudicial officials or private parties."].)  "The time, place, and manner of visitation may be left to the legal guardians, but the guardians shall not have discretion to decide whether visitation actually occurs." (*In re Grace C.* (2010) 190 Cal.App.4th 1470, 1478; accord, *In re Rebecca S.*, at p. 1314 ["leaving the frequency and duration of visits within the legal guardian's discretion allows the guardian to decide whether visitation actually will occur"]; see *In re S.H.* (2003) 111 Cal.App.4th 310, 317 ["the power to decide whether *any* visitation occurs belongs to the court alone."].)  "'We review applicable legal principles de novo, but apply a deferential standard of review to the court's exercise of discretion and resolution of disputed facts.'" (*In re Rebecca S.*, at p. 1314.)

As discussed, the juvenile court ordered visitation for Mother to be monitored by a person mutually agreed upon by Mother and Vernessa or by a professional monitor paid for by Mother if they could not reach agreement.  Mother contends the

visitation order impermissibly delegated authority over visitation to Vernessa because there was discord between Mother and Vernessa, and it was unreasonable to expect that Vernessa would cooperate with Mother in mutually agreeing upon a visitation monitor.

There was no impermissible delegation. The February 21, 2023 order required a professional monitor for Mother's visits with Marcus. The parties then stipulated that the matter be remanded for the juvenile court to specify the frequency and duration of the monitored visits. The November 29, 2023 visitation order did just that by requiring that Mother have a minimum of one one-hour visit per month. The fact the revised order provided an alternative form of monitoring (by a third party agreed upon by Mother and Vernessa) did not mean there was impermissible delegation.

Moreover, although Mother and Vernessa did not get along, there was no evidence Vernessa would refuse to agree to an unpaid monitor. In her November 17, 2023 interview, Vernessa indicated Mother had not had visits with Marcus because Mother refused to pay for a professional monitor, and Vernessa did not want to violate the court's order. Vernessa added, "I have no problem letting her see her son, but she needs to have the monitor, it is a Court order." And notwithstanding her unwillingness to monitor Mother's visits, Vernessa brought Marcus to the front door to talk with Mother when Mother drove to her house in early November 2023, and Vernessa attempted to have Marcus speak with Mother when Mother called in July and early November 2023. On these facts, the court did not abuse its discretion in ordering either an agreed-upon or professional monitor.

11

## DISPOSITION

The juvenile court's November 29, 2023 visitation order is affirmed.

FEUER, J.

We concur:

SEGAL, Acting P. J.

STONE, J.